UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| H.Q. MILTON, INC., <br>         Plaintiff, <br>     v. <br> JESSY WEBSTER, et al., <br>         Defendants. | Case No. 17-cv-06598-PJH <br><br> **ORDER GRANTING APPLICATION FOR TEMPORARY RESTRAINING ORDER** <br><br> Re: Dkt. No. 10 |

Plaintiff's application for a temporary restraining order ("TRO") and an order to show cause re preliminary injunction came on for hearing before this court on November 22, 2017. Plaintiff appeared by its counsel Nancy E. Harris, and defendants Jessy Webster and Hidekazu Matsuba appeared by their counsel Russell Goodrow and Burke Hansen, respectively. Having read the parties' papers and carefully considered their arguments and the relevant legal authority, and good cause appearing, for the reasons stated at the hearing and summarized below, the court hereby GRANTS plaintiff's application for a temporary restraining order.

## BACKGROUND[1]

---

[1] Plaintiff's motions to seal are GRANTED in part and DENIED in part, as follows. Plaintiff's motion to seal portions of Jacek Kozubek's declaration and Exhibit A attached to that declaration is GRANTED. Plaintiff's motion to seal portions of Matsuba's declaration and Exhibits A and B to that declaration is also GRANTED. The portions of these documents that the court now seals are some of the same trade secret information, including customer names or pricing information, that is the subject of the temporary restraining order. Plaintiff's motion to seal the entirety of the termination agreement between Webster and H.Q. Milton is DENIED. However, as stated at the hearing, the court will seal the "separation payment" amount shown in that document.

Plaintiff H.Q. Milton seeks an immediate temporary restraining order to prevent defendants Jessy Webster and Kazu Matsuba from using allegedly misappropriated trade secrets.  Amongst other claims, the complaint asserts that defendants violated the Defend Trade Secrets Act, 18 U.S.C. 1836 et seq. (the "DTSA"), intentionally interfered with H.Q. Milton's prospective economic advantage, and converted H.Q. Milton property.[2] Complaint ¶¶ 32-66.  The present TRO application is based only on the DTSA cause of action.  In support of its TRO application, plaintiff submitted declarations from Scott Kaplan, H.Q. Milton's founder, Jacek Kozubek, a long-time employee and partner at H.Q. Milton, and excerpts of over 1200 pages of text messages between defendants Matsuba and Webster.

Scott Kaplan founded H.Q. Milton, which is one of the world's leading purveyors of high-value, collectible vintage and modern timepieces, with a particular focus on Rolex sports model watches.  Dkt. 10-2, Kaplan Decl. ¶ 1, 4;  Compl. ¶ 2.  H.Q. Milton's business relies upon its well-earned reputation for honesty, reliability, impeccable merchandise and its vast knowledge of vintage and antique timepieces.  Compl. ¶ 2. H.Q. Milton has invested time, energy and resources to build its own proprietary and invaluable set of customer and vendor contacts.  Kaplan Decl. ¶¶ 6-7; Compl. ¶ 4.

H.Q. Milton protects its client source and lead information and does not share it with anyone outside its small company that employed four people in 2017 and currently employs two people.  Kaplan Decl.  ¶¶ 7, 10, 11; Compl. ¶¶ 2, 19.  Because the market for vintage timepieces is volatile, H.Q. Milton protects the information it has acquired about customer interests, pricing, and profit margin.  Kaplan Decl. ¶¶ 4-5, 7-8, 9, 11; Compl. ¶¶ 19-20.  Access to that pricing and profit margin information is invaluable in a fast-moving market where pricing decisions ultimately determine profitability.  Kaplan Decl. ¶ 4, 5, 7-8, 11; Compl. ¶¶ 19-20.

Up until November 7, 2017, defendant Matsuba was employed by H.Q. Milton as a

---

[2] This court has jurisdiction over this action pursuant to the DTSA and 28 U.S.C. § 1331.

sales person.  Compl. ¶ 23.  In that role, Matsuba was given access to H.Q. Milton's customer information, a "customer wish list," and final pricing and margin information, so that he could adequately perform his job duties.  Compl. ¶ 23; Kaplan Decl. ¶ 17-21.

Defendant Webster worked for H.Q. Milton as a professional photographer for approximately 3.5 years.  Compl. ¶ 24; Kaplan Decl. ¶¶ 13-16.  H.Q. Milton fired Webster in December 2016.  Kaplan Decl. ¶¶ 13-16; Compl. ¶ 24.  At that time, H.Q. Milton was aware that Webster intended to pursue vintage watch dealing on his own.  Kaplan Decl. ¶¶ 15-16; Compl. ¶ 24.  A couple of months after leaving, Webster launched his own vintage watch dealing website called oysterpalace.com.  Compl. ¶ 25.

Between February and November 2017, Matsuba, still working at H.Q. Milton, provided Webster with key client information, including names and contact information. Dkt. 10-3, Kozubek Decl. ¶¶ 12-31; Compl. ¶¶ 26-29.  Matsuba also provided Webster with H.Q. Milton's proprietary pricing information.  Compl. ¶¶ 3, 5, 23-29; Kozubek Decl. ¶¶ 26-31.  The text messages show that Matsuba affirmatively steered H.Q. Milton customers to Webster and Oyster Palace.  Kozubek Decl. ¶¶ 23-25; Compl. ¶¶ 26-29. Some of these customers purchased vintage timepieces from Webster and Matsuba, rather than H.Q. Milton.  Kozubek Decl. ¶ 22; Compl. ¶ 27.

The text messages also show that both defendants were aware that their conduct should be kept hidden from H.Q. Milton.  For example,  Matsuba, then still working at H.Q. Milton, rebuffed Webster's request that he leave H.Q. Milton, stating "we may be more successful this way, me staying here, and you doing ur thing . . . I'm a splinter cell for [Oyster Palace] . . . and we actually have access to more, I have information at [my] fingertips, and access to all of my clients, with the credibly [sic] of HQ" Milton.  Compl. ¶ 5. Webster responded "Yessir I'm in! Obviously hahahaha."  Kozubek Decl. ¶ 14.  But Webster then immediately warned Matsuba to "[j]ust be careful with leaving your messages on your comp :-/."  Id.  In another instance, after Matsuba confirmed which watch parts Webster wanted from H.Q. Milton, Webster stated "Yes please ;) and delete this convo from your comp ;)."  Id. at ¶ 23.

**DISCUSSION**

A.  Legal Standard

Federal Rule of Civil Procedure 65 provides federal courts with the authority to issue temporary restraining orders and preliminary injunctions.  Fed. R. Civ. P. 65(a), (b). Generally, the purpose of a preliminary injunction is to preserve the status quo and the rights of the parties until a final judgment on the merits can be rendered, see U.S. Philips Corp. v. KBC Bank N.V., 590 F.3d 1091, 1094 (9th Cir. 2010), while the purpose of a temporary restraining order is to preserve the status quo before a preliminary injunction hearing may be held.  See Granny Goose Foods, Inc. v. Bhd. of Teamsters and Auto Truck Drivers, 415 U.S. 423, 439 (1974).

Requests for temporary restraining orders are governed by the same general legal general standards that govern the issuance of a preliminary injunction.  See New Motor Vehicle Bd. v. Orrin W. Fox Co., 434 U.S. 1345, 1347 n.2 (1977); Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co., Inc., 240 F.3d 832, 839 n.7 (9th Cir. 2001).

An injunction is a matter of equitable discretion and is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 22 (2008); see also Munaf v. Geren, 553 U.S. 674, 689-90 (2008).  A preliminary injunction "should not be granted unless the movant, by a clear showing, carries the burden of persuasion." Mazurek v. Armstrong, 520 U.S. 968, 972 (1997) (per curiam) (citation omitted).

A plaintiff seeking a preliminary injunction must establish that  (i) he is likely to succeed on the merits, (ii) that he is likely to suffer irreparable harm in the absence of preliminary relief, (iii) that the balance of equities tips in his favor, and (iv) that an injunction is in the public interest. Winter, 555 U.S. at 20.  Alternatively, the plaintiff may demonstrate that the likelihood of success is such that "serious questions going to the merits were raised and that the balance of hardships tips sharply in the plaintiff's favor," so long as the other two elements of the Winter test are met. Alliance for Wild Rockies v. Cottrell, 632 F.3d 1127, 1131-32 (9th Cir. 2011).

B.   H.Q. Milton's Application for a TRO

H.Q. Milton seeks a TRO enjoining defendants Webster and Matsuba, their agents, and any others acting in concert with defendants, from any further use or disclosure of H.Q. Milton's confidential information or trade secrets, including but not limited to H.Q. Milton's client or lead information and H.Q. Milton's vintage watch pricing information or any other information taken by Webster and Matsuba.

H.Q. Milton argues that it is entitled to injunctive relief because it can demonstrate a likelihood of success on the merits, a likelihood of irreparable harm in the absence of preliminary relief, that the balance of equities tip in its favor, and that an injunction is in the public interest.

1.   Likelihood of Success On The Merits

H.Q. Milton first contends that it has a strong likelihood of success on the merits because defendants have used "improper means" to obtain H.Q. Milton's protected customer and price-related information as defined by the DTSA. See 18 U.S.C. § 1839(6) (defining "improper means" as "theft, bribery, misrepresentation, breach or inducement of a duty to maintain secrecy . . ."). Specifically, plaintiff alleges that through the scheme described above, defendants misappropriated H.Q. Milton's trade secrets, including H.Q. Milton's customer list and contact information, sales leads, customer interests, and H.Q. Milton's proprietary pricing (e.g., final sales price and profit margins). Not only did defendants use this information to price their own products but defendants also affirmatively steered H.Q. Milton customers to defendants' own competing business, Oyster Palace. Compl. ¶ 26.

The above type of information constitutes protectable trade secrets. MAI Systems Corp. v. Peak Comput., Inc., 991 F.2d 511, 521 (9th Cir. 1993) (holding that under the Uniform Trade Secrets Act the soliciting of customers of former firm constituted trade secret misappropriation); Brocade Commc'n Sys. Inc. v. A10 Networks, Inc., 873 F. Supp. 2d 1192, 1214 (N.D. Cal. 2012) ("[C]ustomer-related information including . . . pricing guidelines . . . and customers' business needs/preferences . . . is routinely given

trade secret protection."); Henry Schein, Inc. v. Cook, No. 16-03166C, 2016 WL 3418537, at *4 (N.D. Cal. June 22, 2016) (holding customer information, margins, and profit percentages used to gain an advantage over competitors were protectable as trade secrets).

In response, neither defendant denies the conduct alleged in the complaint and evidenced by the text messages. Instead, defendants contend that, in contravention of 18 U.S.C. § 1839(3)(A), H.Q. Milton did not make reasonable efforts to keep the purported trade secret information confidential. In support, defendants argue that neither defendant ever signed a nondisclosure agreement, or any other agreement regarding the confidentiality of customer lists, pricing, etc. See Kaplan Decl. ¶ 11. Further, defendants assert that the customer list and pricing information were not password protected or encrypted and that Webster was able to freely access the information even though he was an independent contractor during his time at H.Q. Milton. Dkt. 13-1, Webster Decl. ¶¶ 4-5, 7-8. In addition, defendants contend that Kozubek's conduct of freely providing certain information to Webster after he had left the company, see Webster Decl. ¶¶ 6,7, 10-14, shows that H.Q. Milton did not attempt to protect the purported trade secrets. Lastly, Matsuba attests that as a sales tactic, Kozubek would show clients "confidential H.Q. Milton information" which showed "past purchases and profit margins." Dkt. 14-1, Matsuba Decl. ¶ 4.

Information only qualifies as a trade secret under § 1839 if "the owner thereof has taken reasonable measures to keep such information secret." See 18 U.S.C. § 1839(3)(A). The statute does not require, and defendants have not cited any authority to support a requirement, that "reasonable measures" necessarily includes encryptions, passwords, or confidentiality agreements. While such measures would be prudent and are indicative of an attempt to protect the information, they are not the exclusive measures a company might take to protect its information.

The court finds that H.Q. Milton took reasonable measures to keep its trade secret information confidential. H.Q. Milton is a small company that had four or fewer

1  employees throughout 2017.  Kaplan, H.Q. Milton's founder, attests that the company
2  protects its customer list because its customers often value their confidentiality.  Kaplan
3  Decl. ¶ 7.  In July 2017, the company reiterated its policy that any work done in the office
4  or on H.Q. Milton time was company property and employees could not use contacts,
5  photos or anything else owned by the company without H.Q. Milton's consent.  Id. at ¶ 8.
6  Kaplan further attests that all H.Q. Milton employees acknowledged that they understood
7  those rules.  Id.  Matsuba was an employee when this meeting took place.
8        Further, Kaplan attests that the company takes care not to share cost, final sale or
9  profit margin information outside the company.  Kaplan Decl. ¶¶ 9, 11.  Contrary to
10 defendants' assertion, plaintiff keeps this information in an electronic file that is only
11 accessible via a password protected account.  Kaplan Decl. ¶ 9.  The information in that
12 spreadsheet is only shared with H.Q. Milton employees for purposes of conducting H.Q.
13 Milton business with the company's permission.  Kaplan Decl. ¶ 11.  It was for that
14 reason, and not so Matsuba could pass information to Webster, that Matsuba was given
15 access to the database.
16       In light of the above, the court concludes that plaintiff is likely to succeed on the
17 merits of its DTSA cause of action.  The court also finds that plaintiff has demonstrated
18 that "serious questions going to the merits were raised and that," as discussed below,
19 "the balance of hardships tips sharply in the plaintiff's favor."  Alliance for Wild Rockies,
20 632 F.3d at 1131-32.
21       2.    Likelihood of Irreparable Harm.
22       Next, H.Q. Milton argues that it has established a likelihood of irreparable harm as
23 a result of defendants' wrongful and potentially ongoing acts.  Defendants
24 misappropriated H.Q. Milton's customer and pricing information, which took years for
25 H.Q. Milton to develop.  See, e.g., Kaplan Decl. ¶ 11.  Plaintiff argues the
26 misappropriation of this information in and of itself constitutes irreparable harm.  Further,
27 defendants' use of the information undermined H.Q. Milton's competitive advantage and
28 any further use threatens additional irreparable harm.  Plaintiff also contends that

United States District Court
Northern District of California

1  defendants' targeted solicitation of H.Q. Milton's customers is another basis on which the
2  court can find irreparable harm.  At the hearing, plaintiff also argued that defendants' use
3  of the misappropriated trade secrets threatens to cause harm to H.Q. Milton's reputation
4  and customer goodwill.

5  The court agrees.  Each of plaintiff's identified injuries has been previously held to
6  satisfy the  irreparable harm requirement.  Stuhlbarg Int'l Sales Co. v. John D. Brush &
7  Co., 240 F.3d 832, 841 (9th Cir.2001) ("[e]vidence of threatened loss of prospective
8  customers or goodwill certainly supports a finding of the possibility of irreparable harm");
9  MAI Systems, 991 F.2d at 521 (soliciting of customers of former firm constituted trade
10 secret misappropriation); Fid. Brokerage Servs. LLC v. Rocine, No. 17-4993C, 2017 WL
11 3917216, at *5 (N.D. Cal. Sept. 7, 2017) (potential reputational harm found irreparable);
12 Richmond Techs., Inc. v. Aumtech Bus. Sols., 11-02460C, 2011 WL 2607158, at *22
13 (N.D. Cal. July 1, 2011) ("[T]o the extent that Defendants are using Plaintiff's trade
14 secrets to compete with Plaintiff and to encourage Plaintiff's customers to switch their
15 accounts . . . the Court agrees that Plaintiff has shown a likelihood of irreparable harm.");

16 Defendants' arguments miss the mark.  Defendants argue that money damages
17 are adequate to compensate for any lost sales and that a fledgling startup like Oyster
18 Palace would not challenge H.Q. Milton.  Both of these arguments ignore the harms that
19 H.Q. Milton actually alleges are irreparable.

20 Matsuba next argues that "customers presumably understand how the free market
21 works."  This argument does not address the actual harm alleged—the misappropriation
22 of pricing and customer information.  Additionally, Oyster Palace and H.Q. Milton
23 customers likely do not presume the free market functions through defendants'
24 misappropriation of a competitor's trade secrets.

25 Lastly, Webster also argues that there is no possibility of continued harm because
26 the alleged scheme depended on Matsuba's continued employment at H.Q. Milton and,
27 as of early November, Matsuba no longer works at H.Q. Milton.  This argument fails
28 because defendants have not presented persuasive evidence showing they no longer

possess any misappropriated information.  See I-Flow Corp. v. Apex Med. Techs., Inc., No. 7-1200C, 2010 WL 141402, at *1 (S.D. Cal. Jan. 8, 2010) (rejecting defendants' argument that they have ceased the offending conduct and finding irreparable injury).

For the above reasons, the court finds that H.Q. Milton has shown the likelihood of significant irreparable harm if defendants are not enjoined from using H.Q. Milton's trade secrets, including customer and pricing information.

3.  Balance of Hardships and Public Interest.

Lastly, H.Q. Milton argues that both the balance of equities and the public interest strongly favor granting the requested relief.  H.Q. Milton claims that the benefit of injunctive relief far outweighs any detriment to defendants, as an injunction would protect H.Q. Milton's trade secrets.  Any injunction would be focused on preventing defendants from using H.Q. Milton's confidential information, and such an order would not cause significant hardship to defendants because it would only require them to comply with existing law.

In response, Matsuba argues that these factors favor defendants because Oyster Palace is a new entrant into a market that is dominated by a few firms, including H.Q. Milton.  Relatedly, Matsuba argues that public policy favors more, rather than less, market competition.

The court finds that the balance of hardships and the public interest both favor the issuance of a TRO.  Defendants' arguments in response are essentially that the issuance of a TRO will harm them because it will interfere with their competing timepiece company.  However, nothing in the TRO precludes defendants from competing in the high-end timepiece market.  Instead, the TRO only prevents defendants from using H.Q. Milton's confidential information when conducting their business.  To the extent Matsuba argues that such an injunction would harm defendants' fledgling company, that argument implicitly concedes H.Q. Milton's confidential information was being used and therefore does not weigh in favor of defendants.

**CONCLUSION**

In accordance with the foregoing, the court hereby GRANTS H.Q. Milton's application for a TRO and ORDERS as follows:

1. Defendants, and anyone acting in concert with them, are hereby enjoined from any further use or disclosure of H.Q. Milton's confidential information or trade secrets. This includes any customer or lead information and any H.Q. Milton non-public vintage watch pricing that either defendant knows about because either defendant did business with an H.Q. Milton customer while employed at H.Q. Milton or while in any other business relationship with H.Q. Milton, or became otherwise aware of that information during the defendant's employment at H.Q. Milton or while in a business relationship with H.Q. Milton;

2. Defendants, and anyone acting in concert with them, shall return to H.Q. Milton all records, documents and/or information pertaining to the confidential information described in the preceding paragraph, whether in electronic, handwritten or any other form within five (5) days of entry of this order, including any and all copies. This requirement includes all records or documents, in any form, created by defendants or anyone acting in concert with them, including documents created from memory or based on documents or information that was obtained from or removed from H.Q. Milton;

3. Webster shall file a declaration attesting that he has returned to H.Q. Milton all information subject to this order within seven (7) days from the date of entry of the order;

4. Matsuba shall file a declaration attesting that he has returned to H.Q. Milton all information subject to this order within seven (7) days from the date of entry of the order;

5. This order is effective immediately and does not require the posting of an injunction bond.

6. A hearing to show cause why a preliminary injunction should not issue in this case is set for hearing on Wednesday, January 31, 2018 at 9:00 a.m., in Courtroom 3, at the Courthouse located at 1301 Clay Street, South Tower, Oakland, California. The

10

opening motion should be filed no later than December 27, 2017.  Any opposition must be filed by January 10, 2018, and any reply must be filed by January 17, 2018.  Both parties may conduct discovery in support of their papers until December 22, 2017.

**IT IS SO ORDERED.**

Dated: November 22, 2017

_____
PHYLLIS J. HAMILTON
United States District Judge